## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JILL THOMPSON, Individually and on Behalf of All Others Similarly Situated, | Case No.:  17-cv-1155 |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| | JURY TRIAL DEMANDED |
| AUDI AG, AUDI OF AMERICA, INC., AUDI OF AMERICA LLC, BAYERISCHE MOTOREN WERKE AG, BMW OF NORTH AMERICA, LLC, DAIMLER AG, MERCEDES-BENZ USA, LLC, MERCEDES-BENZ U.S. INTERNATIONAL, INC., MERCEDES-BENZ VANS, LLC, DR. ING. H.C.F. PORSCHE AG, PORSCHE CARS OF NORTH AMERICA, INC., VOLKSWAGEN AG, and VOLKSWAGEN GROUP OF AMERICA, INC. | |
| Defendants. | |

Jill Thompson, on behalf of herself and all others similarly situated, based on publicly-known facts, the investigation of counsel, her own knowledge as to facts pertaining to her, and otherwise on information and belief, complains and alleges as follows:

## INTRODUCTION

1.     This action challenges, under Section 1 of the Sherman Antitrust Act and other laws, the brazen, decades-long conspiracy among the five major German automobile manufacturers, Audi, BMW, Daimler, Porsche, and Volkswagen (the "German Five"). Although they held themselves out to the public as fierce competitors, these carmakers in fact conspired not to compete with each other on automobile innovation and technology, fooling regulators, non-conspiring competitors, the public, and their customers in order to reap supra-competitive profits from the sales of millions of automobiles ("German Five Vehicles").

2.      According to an investigative report by *Der Spiegel*, the German Five have, at least back to the 1990s, secretly and regularly met in order to collude on all aspects of car development.[1] This collusion encompassed costs, pricing, and supplier coordination, as well as technical development of numerous otherwise competitive automobile functions, including brakes, chassis design, electronics, and car assembly.

3.      As a result of the conspiracy, the German Five have for years cheated regulators, cheated actual competition, and extracted from their customers billions of dollars in supra-competitive profits paid for supposedly premium German engineering, innovation, and performance.

**JURISDICTION AND VENUE**

4.      This Court has original federal question jurisdiction over the Sherman Antitrust Act claim asserted herein, pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26. This Court also has jurisdiction over this case pursuant to 28 U.S.C. §1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

5.      Venue is proper in this District pursuant to § 12 of the Clayton Act (15 U.S.C. §22), and 28 U.S.C. §1391(b)-(d), because a substantial part of the events giving rise to plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce

---

[1]      Frank Dohmen, *The Auto Syndicate: Volkswagen, Audi, Porsche, BMW, and Daimler formed a cartel for years; One of the largest in German Economic History*, Der Spiegel (July 21, 2017), available at http://www.spiegel.de/wirtschaft/soziales/volkswagen-audi-porsche-bmw-und-daimler-unter-kartellverdacht-a-1159052.html (last viewed October 11, 2017). Quotations and references throughout this Complaint are based on translations from the article's original publication in German.

discussed below has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, had agents in, or is found or transacts business in, this District. Venue is also proper under 18 U.S. C. §1965(a) because certain of the Defendants transact substantial business in this District.

6.      This Court has personal jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) transacted business throughout the United States, including in this District; (b) marketed and sold German Five Cars throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

7.      The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

## THE PARTIES

**Plaintiff**

8.      Plaintiff Thompson is a citizen of the State of Illinois and resides in this District. She purchased a new 2017 Audi Q5 automobile from Audi Creve Coeur in 2017.

**Defendants**

### *The Audi Defendants*

9.      **Audi AG** is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is a subsidiary of Volkswagen AG and is the corporate parent of Audi of

America, Inc. and of Audi of America, LLC. Audi AG designs, develops, manufacturers, and sells luxury automobiles. According to Audi AG, it sold 1.87 million cars worldwide in 2016.

10.     **Audi of America, Inc.** is a New Jersey corporation, with its principal place of business at 2200 Ferdinand Porsche Drive, Herndon Virginia. Audi of America, Inc. is a wholly-owned subsidiary of Audi AG.

11.     **Audi of America, LLC** is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia. Audi of America, LLC is a wholly-owned subsidiary of Audi AG.

12.     Audi of America Inc. and Audi of America, LLC (together "Audi America") engage in business, including the advertising, marketing, and sale of Audi automobiles, in all 50 U.S. states. In 2016 alone, Audi America sold 210,213 vehicles in the United States.

13.     Audi AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Audi brand worldwide. Audi America advertises, markets, warrants, and distributes new Audi automobiles in all 50 states. Audi AG exerts a close degree of control over Audi America. Together, the Audi defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including thousands in Illinois alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Illinois and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

### The BMW Defendants

14.     **Bayerische Motoren Werke AG** ("BMW AG") is a German corporation with its principal place of business in Munich, Germany. It is a major worldwide automaker and is in the

business of designing, developing, manufacturing, and selling automobiles. BMW AG sold over 2.3 million vehicles worldwide in 2016.

15.     **BMW North America, LLC** ("BMW America") is a Delaware limited liability company with its principal place of business at 300 Chestnut Ridge Road, Woodcliff Lake, New Hersey. BMW America is a wholly-owned subsidiary of BMW AG, and it engages in business, including the advertising, marketing, and sale of BMW automobiles, in all 50 U.S. states. In 2016, BMW America sold 365,204 BMW automobiles in the United States.

16.     BMW AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles worldwide under the BMW, Mini, and Rolls-Royce brands (as well as BMW-brand motorcycles). BMW America advertises, markets, warrants, and distributes new BMW automobiles in all 50 U.S. states. BMW AG exerts a close degree of control over BMW America. Together, the BMW defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including thousands in Illinois alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Illinois and in the rest of the United States, with the intent that these documents would be distributed in all 50 states.

### The Daimler Defendants

17.     **Daimler AG** is a German corporation with its principal place of business in Stuttgart, Germany. It is a major worldwide automaker and is in the business of designing, developing, manufacturing, and selling automobiles. In 2016, Daimler's Mercedes-Benz and Smart brands sold more than 2.3 million vehicles worldwide.

18.     **Mercedes-Benz USA, LLC** ("MBUSA") is a Delaware limited liability company with its principal place of business at 303 Perimeter Center North, Atlanta, Georgia. MBUSA is a wholly-owned subsidiary of Daimler AG, and it engages in business, including the advertising, marketing, and sale of Mercedes-Benz automobiles, in all 50 U.S. states. In 2016 alone, MBUSA sold 346,451 Mercedes-Benz vehicles in the United States.

19.     **Mercedes-Benz U.S. International, Inc.** is an Alabama corporation, with its principal place of business in Vance, Alabama. Mercedes-Benz U.S. International, Inc. is a wholly-owned subsidiary of Daimler AG, and it engages in business, including the advertising, marketing, and sale of Mercedes-Benz automobiles, in all 50 U.S. states.

20.     **Mercedes-Benz Vans, LLC** is a Delaware limited liability company with its principal place of business in Ladson, South Carolina. Mercedes-Benz Vans, LLC is a wholly-owned subsidiary of Daimler AG, and it engages in business, including the advertising, marketing, and sale of Mercedes-Benz vehicles, in all 50 U.S. states.

21.     Daimler AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Mercedes-Benz, Mercedes-AMG, and Smart brands worldwide. MBUSA advertises, markets, warrants, and distributes new Mercedes-Benz, Mercedes-AMG, and Smart automobiles in all 50 U.S. states. Daimler AG exerts a close degree of control over MBUSA, Mercedes-Benz U.S. International, Inc., and Mercedes-Benz Vans, LLC. Together, the Daimler defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including thousands in Illinois alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Illinois and

the rest of the United States, with the intent that these documents would be distributed in all 50 states.

### The Porsche Defendants

22.    **Dr. Ing. h.c. F. Porsche AG** ("Porsche AG") is a German corporation with its principal place of business in Stuttgart, Germany. Porsche AG develops, manufactures, and sells luxury automobiles. Porsche AG is a wholly-owned subsidiary of Volkswagen AG. According to Porsche AG, it sold more than 237,000 cars worldwide in 2016.

23.    Porsche AG has a close relationship with Volkswagen because its founder, Ferdinand Porsche, designed the first Volkswagen Beetle in the 1930s and 1940s. The two carmakers have cooperated on several vehicles in the decades since then. Members of the Porsche family long owned a significant stake in Volkswagen and served on the board, but Porsche AG was a separate and independent corporation until relatively recently. In 2011, Volkswagen AG and Porsche AG consummated a merger agreement that resulted in the Porsche and the related Piech families' holding company maintaining a controlling 52.2% stake in Volkswagen AG, while Porsche AG became a subsidiary of Volkswagen AG along with the other brands in the Volkswagen portfolio (such as Audi).

24.    **Porsche Cars of North America, Inc.** ("PCNA") is a Delaware corporation with its principal place of business located at 1 Porsche Drive, Atlanta, Georgia. PCNA is a wholly-owned subsidiary of Porsche AG, and it engages in business, including the advertising, marketing, and sale of Porsche automobiles, in all 50 U.S. states. According to Porsche AG, PCNA sold 54,280 automobiles in the U.S. in 2016.

25.    Porsche AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Porsche brand worldwide. PCNA advertises, markets, warrants, and

distributes new Porsche automobiles in all 50 U.S. states. Porsche AG exerts a close degree of control over PCNA. Together, the Porsche defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including thousands in Illinois alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Illinois and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

### *The Volkswagen Defendants*

26.     **Volkswagen AG** is a German corporation with its principal place of business in Wolfsburg, Germany. It is one of the largest automobile manufacturers in teh world, and is in the business of designing, developing, manufacturing, and selling automobiles. Volkswagen AG is the parent corporation of (among others) Audi AG, Porsche AG, and the American subsidiaries of all three brands. According to Volkswagen AG, it sold 10.3 million cars worldwide in 2016, including 6.47 million Volkswagen-branded cars, 1.87 million Audi-branded cars, and over 237,000 Porsche-branded cars. In 2016, Volkswagen AG sold more cars than any other automobile manufacturer in the world. Combined with its other brands, Volkswagen controls a roughly 13% share of the worldwide passenger car market, and a considerably higher share of the American market for European cars.

27.     **Volkswagen Group of America, Inc.** ("VWGOA") is a New Jersey corporation with its principal place of business at 2200 Ferdinand Porsche Drive, Herndon, Virginia. VWGOA is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, including the advertising, marketing, and sale of Volkswagen-branded automobiles, in all 50 U.S. states. In 2016 alone, VWGOA sold 322,948 vehicles.

28.     Volkswagen AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under numerous brand names worldwide (including Lamborghini, Bentley, Bugatti, SEAT, Skoda, as well as Ducati motorcycles, Scania and MAN commercial vehicles, and the Volkswagen, Audi, and Porsche brands). VWGOA advertises, markets, warrants, and distributes new Volkswagen automobiles in all 50 U.S. states. Volkswagen AG exerts a close degree of control over the actions of its subsidiaries, including VWGOA. Together, the Volkswagen defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including thousands in Illinois alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Illinois and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

## AGENTS AND CO-CONSPIRATORS

**The Bosch Co-Conspirators**

29.     Robert Bosch GmbH is a German limited liability company with its principal place of business in Gerlingen, Germany, and is the parent company of Robert Bosch LLC. Robert Bosch GmbH directs the activites of its subsidiaries and with Robert Bosch LLC, designs, manufactures, develops, and supplies automotive technology and parts, including as provided to the Defendants for use in certain German Five Vehicles.

30.     Robert Bosch LLC is a Delaware limited liability company with its principal place of business in Farmington Hills, Michigan. Robert Bosch LLC is a wholly-owned subsidiary of Robert Bosch GmbH, and designs, manufactures, develops, and supplies automotive technology and parts, including as provided to the Defendants for use in certain German Five Vehicles.

**Unnamed Co-Conspirators and Agency**

31.     Various persons and/or firms not named as Defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

32.     Each Defendant acted as the agent or joint venture of or for each other Defendant with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## FACTUAL ALLEGATIONS

**The German Five Conspiracy**

33.     According to facts uncovered by leading news outlets, including the investigative cover story published in *Der Spiegel*, at least since the 1990s Defendants have regularly met to coordinate on costs, prices, suppliers, technical development and other competitive aspects of everything from brake controls and chassis to electronics and car assembly for German Five Vehicles.

34.     These meetings were attended by representative experts of each Defendant, who worked together in various groups or sub-groups, such as braking control systems, seating systems, air suspensions, clutches, gasoline engines and diesel engines. Defendants referred to the working groups as "groups of five," reflective of the five major brands involved. More than 60 such working groups existed. Groups met regularly, several times per year.

35.     Defendants have acknowledged that over one thousand such collusive meetings took place just in the last five years. The meetings involved hundreds of Defendants' employees.

36.     Defendants agreed that no single manufacturer would be permitted to step so far ahead of the others that the "competing" manufacturers would encounter problems in selling their

vehicles. If one manufacturer introduced groundbreaking technology, the "competing" manufacturers had to be able to catch up quickly. This was often accomplished by sharing actual proprietary engineering and test data among competitors.

37.    *Der Spiegel* reported that the Daimler Defendants have provided evidence to European Commission and German competition regulators, in a bid to avoid prosecution. VW also has provided evidence in hopes of leniency.

38.    Defendant VW has itself acknowledged its own "suspicion" that Defendants engaged in "behavior in violation of cartel law."

39.    According to *Der Spiegel*, Defendants' "system of collusion encompassed almost all areas of automobile development."

40.    Defendants colluded to avoid competition in areas ranging from the speed at which a vehicle's convertible top could be opened or closed, to diesel emissions. Defendants vowed to avoid an "arms race" on convertible top speeds, just as they colluded to avoid an "arms race" to bigger tanks of AdBlue, a chemical that treats diesel emissions.

41.    While the full scope and extent of Defendants' collusion will be discerned only upon appropriate discovery, *Der Spiegel* reported that Defendant VW informed the EC and German cartel authorities in July 2016 that "Daimler, BMW, Volkswagen, Audi, and Porsche have coordinated matters relating to the development of their vehicles, costs, suppliers and markets 'for many years – at least since the 1990s and to this day.'"

**Government Investigations**

42.    On July 22, 2017, the European Commission announced that it is investigating allegations of an antitrust cartel among a group of major German car manufacturers, including Defendants Audi, BMW, Daimler, Porsche, and Volkswagen.

43.     This investigation is in parallel with an investigation by the German antitrust authority, which has confirmed that it received information from the Defendants that may relate to the operation of an antitrust cartel dating back to as early as the 1990s. The EC has already confiscated documents from Defendants and interviewed witnesses.

44.     It is reported that Daimler came forward and admitted participation in an antitrust conspiracy in exchange for immunity. Volkswagen also has applied for leniency.

45.     On July 25, 2017, it was reported that the U.S. Department of Justice Antitrust Division was reviewing allegations that German carmakers had colluded.

46.     According to *The New York Times* and reports by the news agency *Reuters*, European Union cartel officials conducted a surprise raid of BMW's offices on October 16, 2017. The inspection related to the cartel investigation referred to herein. BMW confirmed that the inspection took place.[2]

47.     On October 23, 2017, the European Commission confirmed that it conducted additional manufacturer inspections on that date.[3] *The New York Times* reported that these inspections took place at Daimler and Volkswagen offices.[4]

**Characteristics of the German Car Market Render the Conspiracy More Plausible**

48.     The structure and other characteristics of the German car market are conducive to collusion. In particular, the German car market has high barriers to entry, demonstrates inelasticity of demand, and is highly concentrated.

---

[2]     *See*   https://www.nytimes.com/2017/10/20/business/bmw-raid.html   (last  viewed October 23, 2017); https://www.nytimes.com/reuters/2017/10/20/business/20reuters-eu-antitrust-bmw.html?_r=0 (last viewed October 23, 2017).

[3]     *See*   http://europa.eu/rapid/press-release_STATEMENT-17-4103_en.htm   (last viewed October 23, 2017).

[4]     *See*   https://www.nytimes.com/2017/10/23/business/daimler-volkswagen-eu-car-bmw.html (last viewed October 23, 2017).

### *High Barriers to Entry*

49.     A collusive arrangement that lowers costs for manufacturers while simultaneously increasing the price of the product to consumers would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. However, where there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

50.     There are substantial barriers that preclude, reduce, or make more difficult entry into the German car market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution, infrastructure, skilled labor, and longstanding customer relationships.

### *Inelasticity of Demand for German Vehicles*

51.     "Elasticity" describes the sensitivity of supply and demand to changes in one or the other. Demand is said to be "inelastic" if an increase in the price of a product results in only a small decline (if any) in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so they continue to purchase despite price increases.

52.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchase substitute products or decline to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

53.     Demand for German vehicles is highly inelastic because there are no close substitutes for those products.

*Market Concentration*

54.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices.

55.     Defendants make up substantially 100% of the German car market.

56.     Capital requirements and technological changes make the German car market difficult for new entrants generally. The collusion over Defendants' vehicles, costs, suppliers and markets increases the barriers to entry for new auto manufacturers. Defendants specifically excluded other car manufacturers from their cartel, so that those manufacturers could not effectively compete in the German car market.

57.     Defendant Volkswagen owns Defendants Audi and Porsche, and in 2016 was the largest vehicle manufacturer in the world.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action on her own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).

**Nationwide Class:**

All persons and entities who purchased or leased a new Class Vehicle in the United States (including its territories and the District of Columbia) during the Class Period. Class Vehicles include all vehicles manufactured and sold or leased in the United States by a Defendant or any current or former subsidiary of a Defendant.

59.     In addition, or alternatively, Plaintiff brings this action on his own behalf, and on behalf of a class of Illinois residents pursuant to Rule 23(a), 23(b)(2), and/or 23(b)(3).

**Illinois Class:**

> All persons and entities who reside in Illinois and purchased or
> leased a new Class Vehicle during the Class Period. Class Vehicles
> include all vehicles manufactured and sold or leased in the United
> States by a Defendant or any current or former subsidiary of a
> Defendant.

60.     The Class Period runs from 1996—by which point the Defendants had reportedly begun to collude—to the present.

61.     Except where necessary to differentiate, the Nationwide Class, the Illinois Class, and their members shall be referred to herein as the "Class," the "Classes" or "Class Members." Excluded from the Classes are Defendants and their affiliates, officers, and directors, Defendants' co-conspirators, and the Judge assigned to this case along with his immediate family. Plaintiff reserves the right to modify, change, or expand the Class definitions upon discovery and further investigation.

62.     **Numerosity:**   Upon information and belief, the Classes are so numerous that joinder of all members is impractical. While the exact number and identities of the individual Class Members are unknown at this time, Plaintiff is informed and believes, and on that basis alleges, that the members of the Classes number in the millions.

63.     **Existence and Predominance of Common Questions of Fact and Law:** Common questions of fact and law exist as to all Class Members. These questions predominate over the questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to:

   a.   Whether Defendants agreed not to compete on technology, innovation, manufacture, or sale of particular aspects of German Five Vehicles;

   b.   The identity of the participants in the conspiracy and the duration of the conspiracy;

   c.   Identification of the particular areas as to which Defendants agreed not to compete;

d.  Whether Defendants engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

e.  Whether Defendants' conduct constituted unfair competition;

f.  Whether Defendants' conduct constituted unlawful, unfair, and fraudulent business acts and practices;

g.  Whether Defendants violated the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*;

h.  Whether Defendants violated the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*;

i.  Whether Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

j.  Whether Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

k.  Whether Defendants concealed their wrongdoing;

l.  The effect of the conspiracy on the prices of German Five Vehicles sold in the United States during the Class Period; and

m.  The appropriate injunctive relief and the appropriate measure of measure of damages, restitution, restitutionary disgorgement, and/or other relief to which Plaintiff and Class Members are entitled.

64.  **Typicality:** Plaintiff's claims are typical of the claims of the Class inasmuch as Plaintiff and each Class Member purchased a Class Vehicle and were similarly injured as a direct and proximate result of the same wrongful practices by Defendants. Plaintiff's claims arise from the same practices and courses of conduct that give rise to the claims of the other Class Members.

65.  **Adequacy:** Plaintiff is an adequate representative because her interest does not conflict with the interests of the Class Members that she seeks to represent, she has retained

counsel competent and highly experienced in complex class action litigation, and she intends to prosecute this action vigorously. The interest of the Class will be fairly and adequately protected by Plaintiff and her counsel.

66.     **Superiority:** A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and Class Members. The injuries suffered by each individual Class Member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for Class Members individually to redress effectively the wrongs done to them. Even if the Class Members could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, Class Members can be readily identified and notified based on, *inter alia*, Defendants' sales records and/or state automobile registration records.

67.     **Declaratory and Injunctive Relief:** Defendants have acted or refuse to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive and declaratory relief, as described below, with respect to the Class as a whole.

## DISCOVERY, TOLLING, AND FRAUDULENT CONCEALMENT

68.     Plaintiff and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were secretly meeting and colluding

on numerous aspects of their vehicle design, manufacture, and sale, that Defendants were concealing and misrepresenting the true nature of their "competition," or lack thereof, and/or that Defendants were using these secret meetings to artificially inflate consumer prices, lower their own supplier costs, and reduce or control technological advancement.

69.     Plaintiff and Class Members had no realistic ability to discovery the presence of this collusion, or to otherwise learn of the Defendants' anticompetitive behavior, until it was discovered and reported by *Der Spiegel* on July 21, 2017.

70.     Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

71.     All applicable statutes of limitation have also been tolled by Defendants' knowing, active, and ongoing fraudulent concealment of the facts alleged herein.

72.     Defendants have known of these secret, anticompetitive meetings since the 1990s when the Defendants began having them. Since then, Defendants have intentionally concealed their collusion from, or failed to notify, regulators, Plaintiff, Class Members, and the driving public.

73.     Defendants actively concealed their anticompetitive behavior from the public.

74.     Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and concealment of the facts alleged herein.

## CLAIMS FOR RELIEF
### COUNT I
### Violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1

75.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

76.     Defendants and their co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of 1 of the Sherman Antitrust Act, 15 U.S.C. 1. The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants agreed not to compete on innovation and agreed to hold themselves out as if they were competing, with the intent and effect of bolstering prices at supra-competitive levels.

77.     Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among Defendants and other unnamed co-conspirators. Defendants' conspiracy is a per se violation of the Sherman Antitrust Act and is, in any event, an unreasonable and unlawful restraint of trade for which there is no legitimate business justification, and if any pro-competitive benefits were caused by Defendants' actions, those benefits were outweighed by the anti-competitive effects of Defendants' unreasonable restraint of trade. Any ostensible pro-competitive benefit was pretextual or could have been achieved by less restrictive means.

78.     Defendants' conspiracy, and the resulting impact on the prices of German Five Vehicles, occurred in and affected interstate commerce and commerce in and between the territories of the United States.

79.     As a direct, intended, and foreseeable and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiff and each Class Member has suffered injury to their business or property. Plaintiff's and each Class Member's damages are directly attributable to Defendants' conduct, which resulted in all Class Members paying higher prices for lesser German Five Vehicles during the Class Period than they would otherwise have paid, but for Defendants' agreement.

80.     Plaintiff's and the Class' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

81.     Plaintiffs and the Class are entitled to treble damages, an injunction to halt Defendants' illegal behavior, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Antitrust Act.

**COUNT II**

**Violation of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.***

82.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

83.     Beginning at a time presently unknown to Plaintiff, but at least as early as 1996, and continuing thereafter to the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful contract, combination, conspiracy, or trust in restraint of the trade and commerce described above in violation of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.* (the "IAA"). Defendants, and each of them, have acted in violation of the IAA to fix, raise, stabilize, and maintain prices of German Five Vehicles at supra-competitive levels.

84.     The violations alleged in this complaint of the IAA consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of German Five Vehicles.

85.     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following: fixing, raising, stabilizing, and/or maintaining the price of German Five Vehicles.

86.     Defendants' behavior has had a substantial impact on trade or commerce within the State of Illinois.

87.     The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of German Five Vehicles has been restrained, suppressed, and/or eliminated in the State of Illinois; (2) prices for German Five Vehicles sold by Defendants and their co-conspirators have been fixed, raised, and/or maintained in the State of Illinois; and (3) those who purchased German Five Vehicles directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

88.     As alleged above, Defendants' contract, combination, and/or conspiracy constitute unreasonable restraints on trade and commerce, all of which are per se violations of the IAA, or in the alternative, violations under the rule of reason.

89.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Illinois purchasers have been injured in their business and property in that they paid more for German Five Vehicles than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of the IAA, Plaintiff and the Illinois Class seek treble damages and the costs of suit, including reasonable attorneys' fees.

## COUNT III
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*

90.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

91.     At all times relevant, Plaintiff, the Class, and Defendants are all persons within the meaning of 815 ILCS 505/1(c).

92.     At all relevant times, Plaintiff and the Class are consumers within the meaning of 815 ILCS 505/1(e). Plaintiff and the Class are consumers within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act given that Defendants' practices were addressed to the market generally and/or otherwise implicate consumer protection issues.

93.     At all times material, Defendant's acts and omissions occurred in the course of trade and commerce within the meaning of 815 ILCS 505/1(f).

94.     Section 2 of the Illinois Consumer Fraud Act provides, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use of or employment of any deceptive, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILSC 505/1 (footnotes omitted).

95.     Defendants' actions to restrain trade and fix the prices paid for German Five Vehicles by Class Members constitutes unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*.

96.     Defendants illegally participated in an agreement among competitors that restrained competition for automotive technology, innovation, and pricing, among other things. Defendants perpetrated the scheme with the purpose of fixing German Five Vehicle prices to the benefit of Defendants.

97.     Defendants have committed unfair or deceptive acts by engaging in the acts and practices alleged herein.  Defendants' conduct included concerted efforts, actions and undertakings among the Defendants with the intent, purpose and effect of: (a) creating and carrying out restrictions in trade and commerce; (b) artificially fixing prices paid by Plaintiff and Class Members; and (c) eliminating competition among Defendants for, among other things, technology and innovation; constituting unfair competition and unlawful, unfair, and fraudulent business acts and practices within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. Defendant's conduct violates public policy by unfairly fixing prices, and unreasonably restrained trade, and Plaintiff and the Class were unaware of the conspiracy, thereby preventing Plaintiff and the Class from negotiating better prices and causing substantial injury.

98.     Defendants' conduct, individually and in concert as alleged above and herein is immoral, unethical, oppressive, unjust, unconscionable and unscrupulous, and caused and continues to cause substantial economic injury to Plaintiff and the Class.

99.     Defendants' conduct is driven by greed, profiteering, and conspiracy to artificially fix prices and suppress competition for technology and innovation, to the detriment of Plaintiff and the Class as alleged herein.

100.     Defendants intended that Plaintiff and the Class rely on material misrepresentations, deceptions, unfair practices, and/or omissions alleged herein.

101.     Defendants' unfair and deceptive conduct are willful and wanton, constitute intentional violations of the relevant statutes.

102.     As a result of Defendants' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Defendants have unjustly enriched themselves at the expense of Plaintiff

and the Classes.  The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

103.    The conduct is unfair, unlawful, or unconscionable under Illinois law.

104.    To prevent their unjust enrichment, Defendants should be required to disgorge their illegal gains for the purpose of making full restitution to all injured Class Members identified hereinabove.

105.    Defendants should also be permanently enjoined from continuing their violations of the Illinois Consumer Fraud and Deceptive Business Practices Act.

106.    Defendants' behavior constituting the violations alleged above has had a substantial impact on trade or commerce within the State of Illinois.

107.    As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Members of the Class have suffered and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## COUNT IV
### Unjust Enrichment and Disgorgement

108.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

109.    During the Class Period, Defendants have been unjustly enriched through overpayments by Plaintiff and Class Members and through the resulting profits enjoyed by Defendants as a direct result of such overpayments.

110.    Plaintiff's and Class Members' detriment and the Defendants' enrichment were related to and flowed from the conduct challenged in this complaint.

111.    Defendants have been enriched and Plaintiff and Class Members impoverished as a result of Defendants' enrichment.

112.    Defendants benefited financially, appreciated the benefit, and accepted the benefit conveyed upon them by Plaintiff and Class Members as a result of the conduct alleged herein.

113.    Defendants' enrichment was unjustified.

114.    Defendants' retention of the benefit violates fundamental principles of justice, equity, and good conscience.

115.    Under common law principles of unjust enrichment, and under the circumstances alleged herein, it would be inequitable for Defendants not to compensate Plaintiff and Class Members for the benefit conferred on Defendants and they should not be permitted to retain the benefits conferred via overpayments by Plaintiff and Class members.

116.    As applicable and only to the extent necessary, Plaintiff and Class Members allege in the alternative that there is no adequate remedy at law.

117.    Plaintiff and Class Members, therefore, seek disgorgement of all profits resulting from such overpayments, and the establishment of a constructive trust from which Plaintiff and other Class Members may seek restitution, under the law of the State of Illinois.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Nationwide Class and the Illinois Class, respectfully requests:

A.    An order certifying the proposed Class or Classes under Fed. R. Civ. P. 23, and directing that notice be provided to all Class Members;

B.    A declaration that any applicable statutes of limitations are tolled due to the fraudulent concealment alleged in this complaint;

C.    That the Court find that the unlawful combination or conspiracy alleged herein constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act,

violation of the Illinois Antitrust Act, and violation of Illinois Consumer Fraud and Deceptive Business Practices Act;

D. An order enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

E. That Plaintiff and Class Members recover damages in the form of restitution or restitutionary disgorgement and/or compensatory damages for economic loss and out-of-pocket costs, treble damages under the applicable federal and state laws, and punitive and exemplary damages under applicable law;

F. A determination that Defendants are financially responsible for all Class notice and administration of Class relief;

G. A judgment against Defendants for any and all applicable statutory and civil penalties;

H. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I. An award to Plaintiff and Class Members of costs and reasonable attorneys' fees; and

J. Such other further relief as the Court may deem appropriate, just, and equitable.


**JURY DEMAND**

Plaintiff demands a trial by jury as to all issues so triable.


DATED:  October 24, 2017                    *s/ Derek Y. Brandt*
                                            Derek Y. Brandt (IL 6228895)
                                            **McCune Wright Arevalo, LLP**
                                            P.O. Box 487

Edwardsville, IL 62025
T: (618) 307-6116
F: (618) 307-6161
dyb@mccunewright.com

Richard D. McCune*
David C. Wright*
**McCune Wright Arevalo, LLP**
3281 East Guasti Road, Suite 100
Ontario, CA 91761
T: (909) 557-1250
F: (909) 557-1275
rdm@mccunewright.com
dcw@mccunewright.com

*Applications *pro hac vice* to be filed

*Counsel for Plaintiffs*